We will hear from Ms. Fogel. May it please the Court. My name is Annie Fogel and I represent the petitioner Ms. N, an asylum seeker from Angola. The Board's overarching legal error in this case was failing to independently analyze whether Ms. N suffered past persecution and was therefore entitled to the regulatory presumption of a well-founded fear of future persecution. This failure to comply with the agency's established responsibilities requires remand under this Court's precedent in Cabrera. Ms. N can show past persecution and obtain the presumption in two ways. First, persecution by state actors, or second, persecution by private actors that the government was unable or unwilling to control. Our briefing covers both, but today I'm focused on the second because it most clearly demonstrates the Board's error. The Board's mixed analysis of whether the government was or would be unable or unwilling to protect Ms. N cannot stand because it denies, disregards key evidence that Ms. N continued to report harm to the police as recently as 2017. One of two things must be true. Either the Board failed to analyze how the government responded when Ms. N continued to seek police protection, or that analysis is so blatantly contradicted by the evidence that the record compels the opposite result. Either way, the case must be remanded so the agency can determine whether Ms. N suffered past persecution and is entitled to the regulatory presumption. I'll start with how the Board committed legal error in its mixed analysis of whether the government was or would be unable or unwilling to protect Ms. N. The Board's error is first apparent in its statement on page 10 of the record, which denies or disregards the key evidence that Ms. N continued to report the harm she suffered to the police as late as 2017. How many times did she report things to the police? There are two instances of harm Ms. N suffered in Angola that she sought police protection from. The first is in 2008 when her house was shot at. She reports once the police respond by telling her to be quiet if she doesn't want to be disappeared. This is on page 675 of the record. Then she goes and reports again. It's not the record on page 675 details multiple times after that 2008 incident, and she's told things like you are provoking your attackers by remaining in Angola. What kinds of attacks was she receiving over and over? Well, the attack in 2008 was her house being shot at. I understand. In 2017, her house was burned down. I understand that's nine years separate, and she spent a good deal of time in Ecuador, didn't she? She did spend some time in Ecuador. In Ecuador in 2016, she was attacked at gunpoint. But what the focus of the inquiry here into whether the government was unable or unwilling to protect Ms. N in the past should be the specific harm she experienced. And I want to focus on 2017 when her house was burned to the ground. This time, attackers left threatening notes referring to her family's political opinion. In fact, the immigration judge on page 488 of the record found these notes sufficient to establish a nexus between that harm and the protected ground of a political opinion. Again, Ms. N went to the police. Again, she was denied. This time, instead of investigating, they told her to find a husband. That incident is arguably the most severe. The most recent is shortly before she fled, and it's targeted violence. We know it's targeted violence because we have a nexus finding. So how the government responded to that incident, which was by not investigating and instead telling her to find a husband, that's on page 672 of the record, that is key evidence of whether the government was unable or unwilling to protect Ms. N. And nowhere in the board's opinion do we see that. The way the immigration judge looked at it on remand was over the course of nine years, she received a total of three threats, none of which resulted in physical harm. So if you look at in 2008, she did in fact call the police. I mean, the police said they couldn't do anything. People get shot at. Their houses get shot at all the time in Houston, Texas. Police can't do anything, right? Does that mean they're all victims of persecution? So what we're really focusing on is one event, 2018. Two responses to that, Your Honor. First, that analysis you point to in the immigration judge's analysis, I believe you're referring to their assessment of well-founded fear. And right now I want to point the court to the board's findings on whether Ms. N. suffered past persecution because if she suffered past persecution, she gets a presumption of well-founded fear. So just looking at this question of past persecution, the board's sole basis for finding no past persecution was whether the government was unable or unwilling to protect. So that's the finding we need to analyze today. And in order to make that finding, the board should have looked at how the government responded to the specific harm Ms. N. experienced. Instead, they cut off that analysis at 2008. In the record on page 10, they conclude that respondents' subjective belief that it would be futile to report harms to the police is not enough to show that the government was unable or unwilling. But it's not a subjective belief that is the evidence here. That statement is clearly contradicted by the evidence that Ms. N. did continue to seek police protection. But she did not seek police protection at all. She did, Your Honor. In 2018. What are you saying? I thought you just quoted something about she didn't seek police protection because she knew it wouldn't be worthwhile. Exactly, Your Honor. That's the board's statement. In the record on page 10, the board states that its respondents' subjective belief that it would be futile to report harms. So the board's analysis is that she didn't report, and that's not enough. But that is directly contradicted by the evidence she did report. They applied the wrong legal standard here. They did the wrong legal analysis. And so there's really three legal errors here. One is the failure to address key evidence, which Cabrera explained as error. And the key evidence here is, how did the police respond when she reported the most severe, most recent targeted attack on her home? And that was by not investigating and telling her to find a husband. You'll find that on page 672 of the record. And then second, that statement on page 10 goes so far as to appear to deny the existence of this evidence that clearly exists in the record. And under this court's precedent in NIFON, a statement that appears to deny the existence of evidence that clearly existed in the record raises too great a concern that the agency did not adequately consider it, and that's exactly what we have here. So what would you be asking this court to do? We would ask this court to remand to the agency, to the board, with instructions to the immigration judge, to independently analyze whether Ms. N suffered past persecution, considering the relevant key evidence of how the government responded when she continued to report harm up until 2017. The board's analysis stops at 2008. What does Dr. Schubert, the expert, say about that issue? I'm sorry? Dr. Schubert, the expert, the affidavit? Oh, sure. I may be pronouncing his name wrong. No, Dr. Schubert, yes. Dr. Schubert, on page 138 to 139 of the record, his testimony is that it is unlikely that police would protect her. So he... Yes, the objective evidence of how the government responded when she continued to report harms is supported by the expert testimony here. I want to make one more point about the legal error in this statement on page 10 of the record about respondents' subjective belief. The board cites to this court's precedent in Sanchez-Amedore, and that's a misapplication of the court's precedent. So the board cites to... The applicant did not report the harm to the police. And so all the court had to go off was the subjective belief. And again, here, that is not the right legal analysis. This is a case where the applicant continually sought police protection and was continually denied. If the court had done the proper analysis here, considering Ms. N's repeated reports after 2008 and how the government responded in 2017 after her house was burned to the ground, they would have found the record compels the result that the government was unable or unwilling to protect. Why did she keep going back to Angola if she felt such fear of persecution? I don't understand that. In her testimony in 671-76 of the record, she just explains that she felt she had nowhere else to go. And she also explains after she was attacked at gunpoint in Ecuador, she felt she had to leave and hoped that Angola was the last place they'd find her. But, of course, they did. We know they did. They found... It seems... Never mind. But they didn't find her fears totally credible, right? The immigration judge found her testimony credible, so we accept all her testimony as true. The well-founded fear, I think, is what you're pointing to, and that ultimately was affirmed. The board reviewed that finding and only affirmed it on the question of whether the government was or would be unable or unwilling to control. And so for the same reasons, the analysis has legal errors relating to the past finding. Those errors also carry through to the future finding. Just to go back to... Just to clarify and confirm, there was a finding of credibility on the record? Yes. And what implications flow from that finding of credibility? The court must accept that testimony as true. And she went back to investigate or something, didn't she? Investigate her parents and her sister's murder? You might be referring to her sister. In 1999, Ms N's sister did return to Angola to try to get answers on what happened to her family. She was disappeared, and Ms N has not heard from her since. There were two missing persons reports filed there and no action was ever taken. They don't know where she is? Correct. In Bertrand, this court explained that before a government is unable, it must first be willing. And here we have police statements demonstrating unwillingness coupled with a lack of action on the police's part. So, again, the police statements here are people disappear here every day, you have no one, you should be quiet. That's on 675. You are provoking your attackers by remaining in Angola, also on 675, and in lieu of investigating after her house was burned down, you are a woman, find yourself a husband. Well, but they did prosecute and sentenced the prison individuals who murdered her family. Correct, Your Honor. That was 20 years ago, so the... Well, the most recent evidence of persecution is five years ago, according to you, six years almost now. It's shortly before she fled. The last instance of persecution was just months before she fled Angola. So the timeline here is her house is burned down, she goes to the police, they refuse to investigate, they tell her to find a husband... I understand that, but if that is the only incident in which she claims the police refused to respond, how does she tie that to their general unwillingness to respond to her? Does one incident suffice to establish a well-founded fear? Well, Your Honor, we're not quite at the issue of well-founded fear yet, because we're trying to determine whether she suffered past persecution. Oh, I thought... Well, you confused me. I confused myself. Okay. But what were the circumstances surrounding the prosecution of the trial for her family members? Was it a public or private trial? It was a private trial. You'll see that on page 673 of the record, which is why we believe, why Ms. N. believes that the government was involved here. The armed forces and police are known to have private trials. Did they go to jail or not? They were sentenced, yes. Well, doggone it. I mean, why does that mean that she's being persecuted? The issue here is whether the government was unable or unwilling to protect, and I think what your question is getting at is does that event 20 years ago outweigh their response in 2017? And first, it doesn't, because it's 20 years ago. It's how the government responded to the murder of a male police commissioner. And second, this analysis we're doing, this discussion we're having about whether it outweighs is exactly what the board was supposed to do and didn't do, and that is the failure to address key evidence that requires remand. Okay, you have an opportunity for rebuttal. We'll hear from Ms. McKinney. Good morning, and may it please the Court, my name is Catherine McKinney, and I represent the respondent, Attorney General Merrick Garland, in this matter. Your Honors, the Court should deny the petition for review because the record does not compel the conclusion that the petitioner established eligibility for relief and protection. Petitioner did not produce compelling evidence that the Angolan government was or would be unable or unwilling to control the private actors she fears. And accordingly, the Court should decline to disturb the denial of asylum or withholding of removal. And in order to establish past persecution or a well-founded fear of persecution, the noncitizen must establish that she suffered or will suffer persecution at the hands of the government or forces that the government is unable or unwilling to control. The petitioner here did not satisfy that standard. Turning to the question of the adequacy of the Board's analysis in this case with respect to the unable or unwilling determination, here, the Board did not engage in impermissible fact-finding, which was an allegation made in the reply brief. Here, it's the government's position that what the Board did was cite to both decisions of the immigration judge. It's clear in the Board's second decision after remand that the Board is citing to immigration judge decision one and immigration judge decision two. So the Board wasn't engaging in this fact-finding in the first instance. What they were doing was referring to both decisions where the immigration judge on the first decision had discussed this government unwilling or unable to control aspect in the past persecution context and in the second decision the immigration judge had addressed in the context of a well-founded fear of persecution. So the Board wasn't engaging in fact-finding when it did this. The second question, however, with respect to the Board's analysis was, was that determination regarding government inability or unwillingness to control, was that determination, that initial determination by the judge in the first decision disturbed on remand? And it's the government's position that it wasn't. In the remand order by the Board, which is found on page 357 of the record, the Board indicated that it was remanding for further fact-finding by the judge. But then if we look further in that decision on remand, the Board says this decision remanding is not intended to limit the judge in any way and the judge may address any findings on remand. So the Board didn't expressly disturb the determination regarding the governmental actor in the past persecution context. So then did the immigration judge do so on remand? And in this case, no. The immigration judge did indicate, the government acknowledges, at page 94 of the record and 101 of the record, the issues that he was going to address or declined to disturb. The government acknowledges that he doesn't say anything there about this government-unable or unwilling determination in the past persecution context, but he also doesn't address it in that decision and he doesn't expressly disturb it. So it's the government's position that it wasn't disturbed and that the Board engaged in a proper analysis when it got the decision back up following remand when it's citing to both decisions. The other contention that the Petitioner's Council had made in their briefing regarding the government's analysis was whether or not the Board erred when it used the language that the petitioner didn't show that the government was or would be unwilling or unable to control the individuals she fears. And as the government noted in our brief, this was an error. Looking at the record as a whole, we have all the necessary findings by the immigration judge and the Board is also citing to them, but the Board is intertwining the analysis of past persecution and well-founded fear persecution when it's talking about whether or not there's a governmental actor or a private actor that the government is unable or unwilling to control. And the agency and the courts have engaged in that analysis in a similar way as the government noted in its brief. We cited two unpublished Ninth Circuit cases where the court was using the exact same language, was or would be, and that's okay. And also looking at how this court has analyzed it in some of the other decisions in Sanchez-Almedor, which is cited both by the Board here and in the government's brief, that's at 30F 4th 529 and specifically at 534, we're looking at the court's analysis there about government unwilling or unable to control. They're using both language evaluating and analyzing whether or not the government is unable to control the actor and then also at the end of that analysis discussing whether or not the government was or were able to control that actor. So it's the government's position that looking at the record as a whole, as long as you have all of the necessary findings by the immigration judge and the Board, that the Board doesn't err when it engages in this sort of intertwined analysis of this issue, especially because it's dispositive of both past persecution and well-founded fear of persecution. And additionally, the government argues that the record here, turning to the merits of this determination, doesn't compel the conclusion either that the petitioner experienced or fears harm by a governmental actor or by private actors that the government is unwilling or unable to control. Looking at the record here as a whole, it's evident that the agency saw and heard the evidence presented and didn't just merely react. And looking at the evidence as a whole here, the record doesn't compel the conclusion that the petitioner suggests. Here we have when the petitioner's family was murdered, the two individuals responsible were arrested, they were sentenced, they served 18 years for that crime. Is it normal for trials of that nature to be held privately? Is that the normal course for trials of that nature to be handled privately? I don't know that there's evidence in the record that it's normal or not normal, or what would be the majority of cases or not majority of cases. I know that the petitioner cited evidence in the record that the police and security forces have internal private court systems. I'm not aware if those are the only ones or if the civilian courts have the capacity to, for any reason, have a proceeding privately also as well for law enforcement investigating reasons or other reasons. Even if there was something to that, the theory is they held a private trial, therefore the perpetrators were government actors. Well, Angola's been in a great deal of turmoil for some decades from insurgents as well as within the government. So even if you accept that speculation, you have the claim of persecution by government actors until 2018, 10 years later practically, and now it's non-government actors. So how many cases do we have where you shift the theory of persecution like that? Is that frequent? So I think... I think actually in many cases and not just in the government context, you would have an individual describing actions that happened to him perhaps 15 or 20 years ago, and we're looking at does that... Do those experiences show, for example, a well-founded fear? I mean, of course the agencies and the courts might look at evidence that happened a long time ago. I think with respect to this specific context, the government unwilling and unable context, there we do have some instances. For example, I believe Bertrand, that case is cited in the government's brief. There I think that the allegations there were with respect to past harm, and the court, when it was looking at it, used the language, I think, again, both languages, used the language the government is or the government was. I'm not arguing. I'm just arguing. I'm just talking about the facts. The facts allege, on the one hand, it was government persecution. On the other hand, they can't control the third-party bad actors. It's just normally it's either the government is responsible for the persecution or the government doesn't control the gangs in El Salvador that wreak havoc on everybody. Yes, Judge Jones, I take that point. I guess in this case . . . Weren't they entitled to put those together within their assessment that this is not a well-founded fear of past persecution? Well, I think here that the agency did analyze it both ways also, respectively. The agency did look at the . . . I'm not concerned about . . . I'm personally . . . I can't speak for my colleagues, but I don't see that as a fatal flaw. I was just talking more logically. But there is a credibility . . . There is a finding of credibility by the IG, I believe. That's correct, Judge Douglas. The immigration judge did find the petitioner credible with respect to what she testified to, and she also submitted a declaration in support of her claims. But that, in this case, with respect to the specific incidences that the petitioner, who was found credible, testified to, she doesn't know who specifically . . . That's actually at the heart of some of these claims. We don't know specifically who the individuals were that perpetrated the murder of her family. We do know, however, that they were arrested, prosecuted, and served an 18-year sentence. And similarly with respect . . . There was uncontroverted expert testimony on maybe what the inferences are, reasoning behind the private trial and not disclosing the names of those who were prosecuted for that. Yes, Your Honor. That goes to the expert, Dr. Schubert, I believe, is the expert who was of the opinion that the private nature of the trial would lend itself to the conclusion that the perpetrators of the original crime in 1998 were government-connected. But although the immigration judge did admit that testimony as expert testimony, the immigration judge explained why his findings weren't necessarily consistent with the inferences that the expert made. And the board in Madera, I believe it's MAMZ, has indicated that although expert testimony could be admitted, the immigration still is the ultimate fact finder. And while experts are allowed to express opinions as to what inferences they would make from that evidence, if the judge isn't required to accept them, the judge is still the fact finder. And if the judge makes findings of facts that are contrary to that, they should just explain why. And we have that in this case. The immigration judge explained why he thought the fact that in the 1998 crime the individuals were prosecuted and served 18-year sentences, it lent itself to the opposite inference that the expert made. And the immigration judge also looked to the country conditions evidence, looked to the response to the 2008 incident. We have other evidence in the record that the agency did consider here. So while they did look to the expert's opinion, they weren't required to accept all the inferences from the evidence that the expert made with respect to that. I'm a little confused. These people are out now, right? I'm sorry. These people, the ones that committed the crime of her family are out, right? They're out of jail now? The record reflects that the petitioner was informed that they finished serving their sentences, I believe, in 2015 or 2016. But they wouldn't tell her who they are. And to me, I just wonder, explain to me how that's not protecting somebody if you don't even tell them who killed their family and who might come kill them if they're brought back. That's what I'm . . . Yes, Judge Daugherty. So that would go to . . . So that is a more recent event, six years ago or seven years ago. It's 2015 or 2016 that those individuals were released. Here we have in the agency decision the specific finding that it was not shown that there was a governmental actor. So we're assuming for this analysis they're not governmental actors. Is the government unwilling or unable to protect her from those actors? And in that respect, we have all of the country conditions evidence in the 2017 country reports, in 2018 country reports, about the administration in Angola that took power in 2017. It has made it a priority to address corruption. And the original 1998 case was supposedly related to an illegal weapons sale or corruption. And now we have an administration that has prioritized anti-corruption. The Angolan Attorney General's Office has an anti-corruption unit. They've engaged with the community on television shows to . . . I'm just saying, like, the fact that they don't tell her who it is, she could be walking down the street and these people walk right by her, or she could be working with them or anything. Well, if they're non-governmental actors, how do they know she's back in the country? I don't believe that we have any evidence in the record. I mean, she keeps going in and out, so . . . Yeah, I think what the dispute with the evidence in the record would be whether or not . . . The petitioner alleges that the subsequent events, the three threats she described, were related to the family's . . . And there are only three, right? There are three that . . . There's the murder of the family. There's the shooting at her house, which could be random violence that would occur in many places. And then there's the burning down of the house. And they argue that she . . . that the board misstated the facts. What do you say about that? So, I don't think that the board is misstating . . . Excuse me. When the board says, that site is to page 10, where the board says, it's your subjective belief that it would be futile to report harms. There's not error in that. And in response to that, the board is saying, and citing the immigration judge as well, we're looking at two instances where your family did receive a police response with respect to the 1998 incident and also with respect to 2008. And looking at the . . . So, that's not error to say that. And also looking at the record as the whole, does the record compel the conclusion here that she met the standard . . . And that's the governing standard, compel. . . . compel the conclusion that the government was unable or unwilling, which this court has said in Bertrand, is either that the government condones the actions of the private actors or exhibits complete helplessness. But you talked about the response to the 1998 incident and the . . . what is it, 2008 incident? What about the response to the 2017 incident? I do not . . . I can't find right now that in the board's decision that they're talking about that. But here . . . Isn't that the other side's complaint that they stopped at 2008 and didn't even talk about the response to 2017? And, again, when this court is looking at agency action, the standard or the adequacy of the decision is . . . Is there enough in the record that we can see that the agency saw and didn't merely react? And with respect to . . . The agency can't mention every single thing. There's only three, as we've heard. They did mention the three incidences. I think the dispute or the criticism is whether or not they mentioned the statements, the specific statements from the declaration about the response to the incidences. I mean, I don't think it's in dispute that the board and the judge discussed the three incidences that happened to her. The question is, are they discussing each statement this police made in response with respect to that third most recent one? And here, the government doesn't have to write a lengthy statement about every single allegation, allegation made. It's looking, did they look at the evidence? Did they see? Did they discuss it? Is there an indication that they merely reacted or did they thoughtfully consider this? And here, in this case, we have the board actually remanding for more fact-finding. The board, the first time, looked at it and said, we don't have any fact-finding about your expert. We don't have any fact-finding specific to some country conditions evidence and send it back. So here, the government would argue that the agency has considered the evidence. There's no indication that the record compels a contrary conclusion, and there's certainly not enough in the record to indicate that the board ignored key evidence. There just simply isn't evidence meeting the compelling standard. So the government, if the court doesn't have further questions, requests that the court affirm the agency's decision. Okay. Ms. Vogel. Thank you. I want to start with the idea that the record has to compel the conclusion here. Of course, that's the factual standard, but before we even get there, we've presented legal errors. Before we can determine what conclusion the record compels, we have to be sure that the agency complied with its established responsibilities, which was to address the key evidence. And it's hard to imagine more probative evidence on the question of whether the government was unable or unwilling to control than how they responded to Ms. N's house being burned down in 2017. That's a failure to address key evidence, and again, it's a statement underneath on requiring remand that appears to deny the existence of evidence. And then I'd like to talk about . . . Well, let's suppose we remanded for a second time, and it goes back to the same I.J. And if she shows up and there's testimony, well, I did call the police, and they say, well, what did they do? Well, they didn't do anything. I mean, she had an opportunity. They did say, you say they're unwilling, right? Isn't that in the transcript? Yes, Your Honor. We know what they said in 2017. Instead of investigating, they told her to find a husband. That's already in the transcript on page 672. All right, but, I mean, so they say, and what else did they do, anything else? No, they didn't do anything else. It could come back to the Board, and the Board could still say that is simply a sexist remark that doesn't show that she has a well-founded fear of future persecution. Yet the Board also found that she didn't have past persecution. Your Honor, this finding would change past persecution. Well, not necessarily. Well, the only reason the Board . . . Because the Board, it has to be compelling, and . . . Yes. As I said, this is not like most of the cases that we see. Your Honor, there are . . . I would agree. The thing that's distinct about this case is not only the police inaction, but coupled with the statement demonstrating unwillingness. So you have these two things acting together. You have statements saying you're provoking your attackers by remaining here, find yourself a husband, and then you have no effort. So no . . . There are no cases that Respondent points to, either in this circuit or other circuits, where courts have affirmed the Board where the record shows as little police action as it does here, and then we also have those police statements. And I want to talk about . . . But you have her statement in the police statements. Which we must take as true. And her speculation that they would not do anything. Your Honor, the police statements we have to accept as true because that testimony is credible. So we know the police said that. And it's not speculation. It's objective evidence about how they refused to investigate. Your claim is not that she was persecuted because she was a female whom the police wouldn't protect. No, Your Honor, but . . . Her claim is that she's persecuted because they killed her family 14 years ago. Yes, Your Honor, and we have an excess finding on that point. I don't . . . We don't need to know the police's motive for not helping her. All we have to establish is that the police, or the government, was unable or unwilling to protect her. And we've established that through police statements demonstrating unwillingness and a lack of action. But I want to quickly come back to the 2017 incident of her house being burned down and why that is so different from the sentencing of her family's murderers in 2008 and so why it must have been considered for this decision to stand. And that's because this is, to Judge Jodi's point, after the men who were sentenced for the murder were released. So we know they're out there. And two, it's the harm that we know is targeted because of the immigration judge's findings. So we know this is not generalized violence. We know it was targeted and directed at her. How many times has the government changed since 2009? I don't know the answer to that, Your Honor. Well, more than once. My point is, does she say she's fearful because the murderers were released? She does say that in her testimony, yes. That's why she led to Ecuador. Well, that's really interesting. And that's on what? On the assumption that they were part of a government that's no longer in power and that the current government is somehow not unwilling to protect her against the government that they're now putting in jail because they're out against corruption? Is that your theory? Your Honor, she does believe there was government involvement. She believes. Some of the evidence that shows that is the secret trial and her inability to get information. But regardless, I don't think we need to know. But again, even if that were true, they are members of a government that has been deposed, removed, and corruption trials against. And so how does that fit with, but the government is unwilling to protect her against the guys who are now the enemy of the government? Well, I first wanted to point out to your question of why she even believes they're after her. I don't think we have to answer that because we know she was right. Her house was burned down. But you have to compel the conclusion. Here, we just have to show that the 2017 incident was key evidence that the Board failed to address. What evidence, if it's remanded, what evidence do you foresee that would be additional evidence to prove the government was unable and unwilling to protect her? I think the evidence that they did not investigate after 2017 and told her instead to find a husband. I think there's additional statements after 2008 that are not in the Board's opinion, which are telling her she is provoking her attackers by remaining in Angola. So I think that would be strong evidence. 2008? Yes, Your Honor. Yes. OK. Thank you. Thank you very much. We have your argument. Court will stand in recess.